IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF TEXAS

TEXARKANA DIVISION

| | | |
|---|---|---|
| LaQUINCE HOGAN | § | |
| v. | § | CIVIL ACTION NO. 5:21cv144-RWS-JBB |
| CHANDRA ANDERSON, ET AL. | § | |

INITIAL REPORT AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE

Plaintiff LaQuince Hogan, proceeding *pro se*, filed this civil rights lawsuit under 42 U.S.C. §1983 complaining of alleged violations of his constitutional rights. The lawsuit was referred to the undersigned United States Magistrate Judge pursuant to 28 U.S.C. 636(b)(1) and (3) and the Amended Order for the Adoption of Local Rules for the Assignment of Duties to United States Magistrate Judges. Plaintiff's second amended complaint names as Defendants Health Services Administrator Karen Ashley, Nurse Pulse, Nurse Chandra Anderson, Officer Marie Johnson, Office Brown, Detective Dustin Thompson, Captain Stuart Boozer, Lt. Sullivan, Warden Page, Sharonda Long, the Bowie County Sheriff's Department, the City of Texarkana Police Department, the Chief Nursing Officer, Quality Officer, and Risk Manager at Wadley Regional Medical Center, Nurse Jan Burke, Director of Operations for LaSalle Corrections Jay Eason, Deputy Directors William Straughn and Dale Reed of the Arkansas Department of Corrections, and Amanda Pasley, PREA Coordinator for the Arkansas Department of Corrections.

**I. The Plaintiff's Complaint**

The Plaintiff's second amended complaint is the operative pleading in the case. *See* Dkt. No. 15. In this complaint, Plaintiff states that on November 25, 2019, at about 11:15 a.m., while confined in Bowie County, he suffered severe pain in his spine, neck, and legs and then lost feeling in his legs and fell to the floor. Dkt. No. 14-1 at 4. Nurses Pulse and Gilchrest were the first medical personnel to arrive. *Id.* at 8. Pulse used her cell phone to call her supervisor, Ashley. *Id.* She then said that

1

Ashley had instructed her to get Plaintiff into a wheelchair. *Id.* Nurse Gilchrest said, "I'm not touching him," and stepped back. Pulse told Lt. Manning to get Plaintiff into the wheelchair, assisted by an inmate named Dawson. *Id.* They picked Plaintiff up by his arms and legs, causing his pain to become worse. *Id.* The nurses then took Plaintiff to the infirmary, where he told Nurse Willis that he was suffering neck and back pain and that he could not feel his legs. *Id.*

At about 12 p.m., Plaintiff states that he was taken to holding cell 149. *Id.* at 8-9. Lt. Sullivan came in and spoke to Plaintiff about what had happened. *Id.* at 9. Nurse Dean came in with a syringe and asked Plaintiff if he could feel his legs. *Id.* Plaintiff told her no, and she poked him with the needle in both feet. *Id.* He did not move but asked her what she had injected him with, and she stated that she had not injected him with anything and then left. *Id*. Lt. Sullivan stated, "[m]an this is b***s***. If you need me for anything, call me," and left. *Id.*

Plaintiff states that he was left in the holding cell. *Id.* At about 3 p.m., he could no longer hold his bladder and urinated on himself. *Id.* He banged on the door, and Captain Boozer stopped at it. *Id.* Plaintiff told Boozer he had urinated on himself, and however Captain Boozer walked away. *Id.* Lt. Manning stopped by shortly thereafter, and Plaintiff told him that he had urinated on himself. *Id.* Manning had Plaintiff taken to Bravo barracks. *Id.* Inmate Dawson and another inmate named Anderson helped Plaintiff shower and get into clean clothes. *Id.* Dawson took Plaintiff back to cell 149. *Id.*

Sometime later, Plaintiff states that Lt. Sullivan stopped by his cell, and Plaintiff told him he was going on a hunger strike. *Id.* Sillivan asked why and Plaintiff said that he was getting feeling back in his legs, but now he had burning pain in his feet and he was not being taken seriously or treated fairly. *Id.* Sullivan said that he would see what he could do about having Plaintiff taken to a hospital. *Id.*

At about 7:50 p.m., Plaintiff states that officers Marie Johnson and Office Brown came to take him to the hospital while Sgt. Martin was filming with a handheld camera. *Id.* He was taken to the emergency room at Wadley Regional Medical Center, where a CT scan and an MRI were done. *Id.* at 10. The resulting images showed bulging discs in his neck and spine. *Id.* Nurse Chandra Anderson

came into the room and told him to lie on his side and pull down his pants for two injections. *Id.* He complied even though it was painful. *Id.* After the two injections, the nurse suddenly rammed something into Plaintiff's anus. *Id.* Plaintiff asked, "[m]a'am, did you just rape me?" Anderson replied, "I've been an RN for 13 years," and then ran out of the room. *Id.*

Plaintiff states that he looked at Officer Johnson and said, "Ms. Johnson, I feel like that lady just violated me." *Id.* Officer Johnson did not respond. *Id.* Plaintiff repeated this complaint to Johnson and Brown when they were back in the transport van. *Id.* Plaintiff contends that this type of complaint is considered a violation of the Prison Rape Elimination Act, and Johnson and Brown had protocol and procedures which they should have followed but did not. *Id.*

After they returned to the Bowie County Correctional Center, Plaintiff stated that he was put back in cell 149. *Id.* Later that day, November 26, 2019, he was returned to his barracks, where inmate Dawson and another prisoner helped him transfer to his rack. *Id.* The wheelchair was taken at that time. *Id.* About a week later, on December 4, 2019, Plaintiff stated that he wrote to the Bowie County Sheriff's Department saying that he wanted to talk to someone about a sexual assault. *Id.* On December 10, Bowie County Detective Dustin Thompson came to interview him. *Id.* at 11. After the interview, Sillivan and Boozer took Plaintiff back to his barracks, packed his property, and then put him in isolation cell 212, which had no handrails. *Id.* Boozer came back later and got the wheelchair. *Id.*

The next day, Plaintiff states that while trying to get to the toilet, he fell, urinating on himself. *Id.* He called out and an officer called the medical department. *Id.* Even though Plaintiff states that he was experiencing severe pain from his spine to his feet, the medical personnel picked him up by his arms and put him in a wheelchair. *Id.* The medical personnel took him to the infirmary and took his vital signs, then returned him to the cell in his same soiled clothes. *Id.*

On December 13, 2019, Plaintiff states that he sent a request to Warden Page saying that the medical staff and security "violated the laws and provision of a contract" by denying him adequate medical attention and care, placing him at risk of sustaining another injury, denying him access to the law library, the use of a shower and toilet, unlawfully confining him to segregation, and failing to

provide mobile support. *Id.* Warden Page responded by saying that according to the medical department, Plaintiff has been released to return to general population. *Id.* Plaintiff complains that the warden did not address any of the civil rights violations which he had just been made aware of. *Id.*

The next day, Plaintiff states that he wrote to Warden Wilson saying he believed the officers were trying to break him by using a technique called "poor punishment" to intimidate him. *Id.* He said that he was unable to use the phone, go to the toilet, shower, or eat. *Id.* at 11-12. Captain Boozer responded to the letter by saying, "[we] cannot have you in a barracks if you cannot walk. We need to be able to assist you to and from medical." *Id.* at 12.

On December 19, 2019, Plaintiff stated he filed a grievance, complaining that this alleged technique was being used against him by Lt. Sullivan and Captain Boozer. *Id.* The grievance was rejected as untimely even though it was filed ten days after he was placed in isolation and his wheelchair taken. *Id.*

Plaintiff contends that he was forced to wear the clothes in which he had urinated from December 11 to December 15, when Lt. Manning came to his cell and helped him into a wheelchair. *Id.* He took Plaintiff to Bravo barracks, where other inmates helped him shower and put on clean clothes. *Id.* Manning then took him back to cell 212. *Id.*

On December 17, 2019, Plaintiff stated that officers came to the cell and told him to pack his belongings because he was moving to the general population. *Id.* He says that he was ready to be out of isolation, but he was still suffering from sharp pain in his spine, legs, and feet when he stood up. *Id.* Plaintiff asked for a wheelchair, but it was denied. *Id.* He could not walk from the isolation cell to the barracks, so he received a disciplinary case for refusing to leave restrictive housing. *Id.* Plaintiff says that this was not the case, he wanted to leave, he just could not walk without assistance. *Id.*

That same day, Plaintiff wrote to the Texas Department of Criminal Justice seeking help but was informed that this agency had no jurisdiction over county jails. *Id.* at 12-13. He wrote to Ms. Ashley on December 18 asking for a walking cane, but she responded that "there is nothing more we can do." *Id.* at 13.

On December 27, 2019, Plaintiff says that he was moved from the isolation cell back to Bravo

4

barracks. *Id.* To get there, he supported himself by holding onto the back of a large laundry cart carrying his property. *Id.* The inmates in the barracks knew he wanted to be independent and do things on his own, and one inmate loaned him a walking cane. *Id.* He says that he could move short distances with the cane and the support of closely placed bunks. *Id.*

Three days later, on December 30, 2019, Plaintiff states that he was moved by wheelchair to a transport van. *Id.* He was taken to his current unit, the Ouachita River Correctional Unit (ORCU) in Arkansas, where he was placed in the special needs unit and was allowed to keep the wheelchair. *Id.* at 13-14.

A week later, on January 8, 2020, Plaintiff stated that he was called out to see a provider named Long, who has a reputation for being rude to inmates because she believes they are all hypochondriacs. She took away his wheelchair and gave him a walker, which caused him great pain. *Id.* at 14. After further complaints about Long, Plaintiff states that in March 2020, he wrote to the U.S. Department of Justice, which told him to file a police report with the Texarkana police department. *Id.* at 16. He contacted the Texarkana police in June of 2020, and they responded the next month, saying that there was insufficient evidence to support the listed charge and because Plaintiff had been in the custody of the Bowie County Sheriff's Department, the incident would be in their jurisdiction to investigate further. *Id.* However, Plaintiff complains that the sexual assault occurred at Wadley Hospital in Texarkana, giving the police department jurisdiction to investigate. *Id.*

After again complaining of medical care received in the Arkansas Department of Corrections, Plaintiff states that he filed a grievance on April 8, 2020, complaining of an ongoing conspiracy to violate the rights of inmates under due process and equal protection. *Id.* at 17. He also complained of sexual abuse. *Id.* The response from the deputy director of the Arkansas Department of Corrections said that Plaintiff reported the assault two months later, but this was false because Plaintiff had reported it to the officers immediately and then wrote to Bowie County Criminal Investigation Division on December 4, 2019, nine days after the assault. *Id.* A CID detective had interviewed him, and retaliation began immediately thereafter. *Id.* He says that he names Amanda Pasley, the Prison Rape Elimination Act coordinator for the Arkansas Department of Corrections, in connection

5

with this claim. *Id.*

In November 2020, Plaintiff stated that he wrote to the Texas Medical Board, which told him that his complaint had been forwarded to the Board of Nurse Examiners. *Id.* Plaintiff wrote to the Board of Nurse Examiners but received no response. *Id.* at 18.

On December 17, 2020, Plaintiff stated that he sent a certified letter to Lt. Manning, who signed the letter but did not respond. *Id.* He wrote to the Arkansas Department of Health on December 18, 2020, and to Bowie County District Attorney Kelley Crisp on January 12, 2021, but they also did not respond. *Id.*

On April 12, 2021, Plaintiff filed grievance no. OR-21-00306, to which the response from Deputy Director Reed was that the matter was under investigation and the merits of the appeal would not be addressed. *Id.* at 19. He then filed grievance no. OR-21-00633 on August 12, 2021. *Id.*

According to Plaintiff, MRI studies were performed on his cervical and lumbar spine and showed "notable canal narrowing and cord compression at C4-5 and C5-6." *Id.* at 20. He says that cord compression is "very serious" and can cause shooting pains in the legs and feet. *Id.*

According to Plaintiff, the transport officers, the staff at the Bowie County Jail, and every other agency to which he has reported the sexual assault have dismissed it without a proper investigation or have placed responsibility on another department. *Id.* He says that sexual assaults upon prisoners still violate Tex. Penal Code art. 22.011, and charges should be filed just as they are for someone who is not a prisoner. *Id.*

Plaintiff said when he was sexually assaulted, he was in the Bowie County Jail, which he says - incorrectly - is a facility of the Texas Department of Criminal Justice. *Id.* He complains that the Prison Rape Elimination Act has not been adequately implemented in TDCJ facilities and that Arkansas is also not in compliance with the PREA, which is the Prison Rape Elimination Act of 2003, 42 U.S.C. § 15601 *et seq. Id.* at 21.

Plaintiff also attaches a number of exhibits to his second amended complaint. The first of these is grievance no. BOW19-00168, dated November 25, 2019. Dkt. No. 14-2. At 1. This grievance complains of deliberate indifference to his back pain but does not mention a sexual assault. *Id.* The

response to the grievance by Nurse K. Ashley states that Plaintiff was seen standing and talking without difficulty until Plaintiff saw the medical personnel, and then he began complaining (without grimacing) about back pain and legs being numb. *Id.* at 3. He was placed in "seg med observation" and refused to help the medical personnel get him up and into a wheelchair, saying that he could not move his legs at all. *Id.* Later that evening, he did cooperate in getting placed in the van for an ER visit, where it was reported that he had a CT and MRI showing mildly bulging discs to L4 and L5. *Id.*

In the grievance appeal, the Deputy Director stated that an MRI and CT scan were done at the emergency room and determined that the soft tissue was unremarkable, the vertebrae were normal, the spinal cord visualization was normal, and there was no evidence of acute lumbar spinal fracture. *Id.* at 1. The grievance determined that Plaintiff's appeal was with merit because of the lack of documentation that an assessment was performed upon Plaintiff's arrival in the infirmary. *Id.*

Plaintiff's next exhibit is a handwritten note dated December 4, 2019, saying, "Att: CID - I need to speak with someone regarding a sexual assault." *Id.* at 6. The third exhibit is a letter dated November 24, 2020, from Jan Burke, a Patient Advocate at Wadley Regional Medical Center. *Id.* at 7. The letter states that the hospital received a letter from Plaintiff on November 20, 2020, complaining that Nurse Anderson had rammed a plastic tube or something into his anus. *Id.* at 7. An investigation was conducted, which determined that there were no tests or procedures which would have entailed anything being inserted into his anus, although he had two intramuscular injections of medications into his buttocks on the left and right side. *Id.* The letter stated that the hospital no longer employed Nurse Anderson and was not available for interview. *Id.* Two officers from the Arkansas Department of Corrections were with Plaintiff, but they were not employees of the hospital and could not be interviewed. *Id.* The complaint was reviewed by the hospital grievance committee, including the hospital president, the chief nursing officer, the quality director, the risk manager, and Nurse Burke, but because of the amount of time that had passed since the allegation and the fact that the nurse and the officers could not be interviewed, Plaintiff's grievance could not be substantiated. *Id.* at 8.

After a grievance asking for wet wipes, which was denied because there was a shower in the seg cell, Plaintiff filed a grievance dated December 13, 2019, complaining that he had been denied

adequate medical care, access to the law library, and use of the shower, he has been confined to segregation, and been denied mobile support.  The response stated that there was no medical reason he could not get up and walk and care for himself. *Id.* at 11.

On December 12, Plaintiff filed a grievance complaining of being placed in segregation, saying that all of his normal day-to-day activities had been disrupted and the medical department had consistently denied him a wheelchair or walker. *Id.* at 13. The response to this grievance, signed by Captain Boozer, said that Plaintiff cannot be in a barracks if he cannot walk because the officers need to be able to assist him to and from medical. *Id.*

On December 18, Plaintiff filed a grievance asking for a walking cane. *Id.* at 14.  The response from Nurse Ashley says that Plaintiff has been seen multiple times being leaned over and has been cleared by a CT and an MRI at the emergency room, so there is nothing more they can do. The Arkansas Department of Corrections has been contacted. *Id.*

The next exhibit is a letter from the Texarkana police department stating that there was insufficient evidence to support a charge of sexual assault and that because Plaintiff was in the custody of the Bowie County Sheriff's Department, the incident would be theirs to investigate further. *Id.* at 19

On December 19, 2019, the Office of Professional Standards of the Texas Department of Criminal Justice - Health Services Division wrote to the Plaintiff, telling him that TDCJ has no jurisdiction over local or county jails and that he had to direct his concerns to the local or county jail complaint process. *Id.* at 24.

Plaintiff also has a written statement dated December 17 saying that he is handicapped from various back injuries and specialists have diagnosed his symptoms, but Nurse Karen Ashley has slandered him by spreading false reports, causing him to lose opportunities to be examined by providers. *Id.* at 25. He states that the medical department will not furnish him with a wheelchair, he cannot reach the showers, phone, or toilet, and he cannot go to the law library. *Id.* at 26. He cannot put any weight on his right leg, but on December 12, Nurse Ashley told him "the walls can assist you." *Id.*

On April 9, 2020, the U.S. Attorney for the Eastern District of Arkansas wrote Plaintiff and told

him that if he was sexually assaulted in Texarkana, Texas, he had to file a police report with the Texarkana police department, since that is outside the jurisdiction of the Eastern District of Arkansas. *Id.* at 27.

Plaintiff next attaches a lengthy article from a publication called Prison Legal News concerning the implementation of the Prison Rape Elimination Act. *Id.* at 28. The article discusses a number of state institutions and contains numerous vignettes of incidents of sexual assault from around the country but does not mention Bowie County. *Id.*

A consultation request dated July 16, 2021, says that Plaintiff is using a rollator walker and is reporting subjective worsening of symptoms. *Id.* at 42. MRI studies performed in June 2020 showed notable canal narrowing and cord compression at C4-5 and C5-6. *Id.*

Plaintiff attaches a grievance from April of 2017 in which he said that he was afraid Officer Jernigan will sexually assault him. *Id.* at 47. He stated that Jernigan made him pull his clothes down twice during a shakedown, which is not policy, and "molested me with his eyes." *Id.* He claimed Jernigan has called him a "shower shark" and a "meat lover." The grievance was determined to be unfounded. *Id.*

A later grievance response dated May 28, 2020, referred to a grievance filed on April 8, 2020, concerning an incident of alleged sexual abuse which had been referred to the Internal Affairs Department in January of that year. The grievance response stated that the Internal Affairs department had investigated the complaint and could not substantiate the allegations. *Id.* at 48.

A grievance response dated May 24, 2021, stated that Plaintiff had filed a grievance on April 12, complaining that he was still suffering from Anderson's sexual assault in November of 2019. *Id.* at 49. The response says that the PREA coordinator has referred the grievance to LaSalle Corrections, which will cause an investigation. *Id.* Plaintiff will receive the findings of the investigation when completed, but these findings will not come from the Grievance Officer. *Id.* The response to the grievance says that since the matter is under investigation, the merits of the appeal will not be addressed. *Id.*

A grievance response dated October 1, 2021, referred to a grievance filed by Plaintiff on

August 21, 2021, complaining of being placed in segregation in December of 2019 and left without mobility for 17 days. *Id.* at 50. This grievance was rejected at the unit level as untimely, and the finding of untimeliness was upheld in the grievance appeal. *Id.*

On December 17, 2020, Plaintiff sent a notarized letter to Lt. Manning recounting the incident. *Id.* at 51. He wrote to District Attorney Kelley Crisp on December 23, 2020, asking that charges be filed against Anderson. *Id.* at 55.

After a copy of a disciplinary case that he received for refusing to leave restrictive housing on December 17, 2019, Plaintiff attaches a copy of a letter from the Texas Medical Board advising him that they do not have jurisdiction and saying that his complaint will be referred to the Board of Nurse Examiners. *Id.* at 58-59. Plaintiff also attaches letters to the Texas Board of Nurse Examiners and the Arkansas Department of Health. *Id.* at 60-61.

Plaintiff also included exhibits with his original complaint. After attaching a copy of the letter he received from Nurse Jan Burke, detailed above, Plaintiff includes a letter from Detective C.A. Harris of the Texarkana police department dated July 13, 2020, advising him that Harris had reviewed Plaintiff's correspondence and medical records from the night of the incident spoken to investigators from the Bowie County Sheriff's Office, and determined that there was insufficient evidence to support the listed charge. Dkt. No. 1-1 at 6. Because Plaintiff was in the custody of the Sheriff's Office, the incident would be in their jurisdiction to investigate further. *Id.*

Plaintiff's December 4, 2019 grievance said that on November 25, he experienced a pain like a sharp knife cut along his spine which caused his legs to give way. *Id.* at 10. The medical staff was called, but they did not follow proper protocol. *Id.* He had pre-existing injuries to his back. *Id.* The response to the grievance by Nurse Ashley says that Plaintiff was seen by a nurse standing talking to other inmates, acting as if there was no pain until he saw the nurse. *Id.* He was offered a trip to the hospital by van but refused to assist the officers in getting to the van. He was finally sent to the hospital that evening and found to have mild bulging discs at L4 and L5. *Id.* Plaintiff wrote a reply to the grievance response saying that Nurse Ashley was making a false report and that Nurse Pulse had been notified that he was experiencing severe pain, but she made "derogatory remarks in a very unethical

and unprofessional manner." *Id.* He says that he had to load himself in the van while injured and in pain. *Id.*

Plaintiff also complains that Nurse Ashley answered both his Step One and Step Two grievances even though she is named in the grievance, which is a conflict of interest. *Id.* at 11-13. He says that she does not dispute that protocol was not followed and contends that "properly trained medical staff would not have placed someone with a spinal injury in a wheelchair, nor would they have forced me to load myself (the injured) into a van." *Id.*

The Step Three grievance response says that a review of Plaintiff's medical records shows that when nursing staff arrived with the wheelchair, he was lying on the floor by the bathroom wall, and he was placed in a wheelchair. *Id.* at 14. When he arrived at the infirmary, he was no longer crying and was holding a conversation. *Id.* He said that he could not move his legs and was assisted with moving his foot off the wheelchair, but he said that it hurt. *Id.* He later told the nursing staff that he had urinated on himself because he could not get up to use the bathroom. He was sent to the ER, where MRI and CT scans were done. *Id.* The MRI showed that his sort of tissue was unremarkable, his vertebrae were normal, and there was a normal visualization of the spinal cord. *Id.* The CT scan showed no evidence of acute lumbar spinal fracture. *Id.*

Plaintiff next attaches two more grievances reiterating the incident and complaining of inadequate medical care. *Id.* at 15-16. The response to the first of these says that he was seen in and cleared by the emergency room and did not receive inadequate care, and the second says that "on investigation, this is a duplicate and false accusation." *Id.*

On December 23, 2019, Plaintiff filed a grievance complaining that Nurse Ashley and the medical department refused to provide mobile support to him, and he fell and was "left to sit around with urine-stained clothes on for hours, unable to shower for hours." *Id.* at 17. He again complains that they broke protocol by first moving him off the floor without stabilizing him. *Id.* The response to this grievance says that he was cleared of injuries and given adult briefs. *Id.* He was in segregation and had a commode in his cell, so he would have one close by. *Id.*

The next seven pages consist of grievances, which were also included with his second

amended complaint and have been discussed above. *Id.* at 25. The next grievance concerned an alleged violation of the grievance procedure by Officers Ellis and Johns. *Id.* After another grievance was included with his second amended complaint, Plaintiff attaches a statement dated December 18, 2019, recounting his treatment in the jail. *Id.* at 28.

On March 3, 2021, Plaintiff wrote to the Texas Board of Nursing that he had filed a complaint with the Bowie County prosecutor's office but had not heard back. *Id.* at 31. However, he has received communication from Wadley Regional Medical Center. *Id.*

On September 24, 2020, PREA Coordinator Amanda Pasley of the Arkansas Department of Corrections wrote to Plaintiff saying that his allegations had already been investigated and determined to be unsubstantiated. *Id.* at 32. The Arkansas Attorney General's office sent a letter saying that the Attorney General has no supervisory or administrative authority over the Arkansas Department of Corrections, but the duty of the Attorney General to represent the State and its agencies creates a conflict of interest which prohibits the Attorney General from providing individuals or defendants with private legal advice or guidance, so Plaintiff should consult a public or private attorney. *Id.* at 34.

Plaintiff filed a grievance on December 10, 2020, complaining that the staff at the Bowie County Correctional Center was not properly trained to handle PREA situations, but the grievance was rejected as being untimely. *Id.* at 35-39. This determination was upheld on the grievance appeal, despite Plaintiff's assertion that PREA grievances are not subject to the 15-day time limit. *Id.*

On December 19, 2019, the Texas Department of Criminal Justice wrote to Plaintiff, informing him that the TDCJ Health Services Division has no jurisdiction over local or county jails. *Id.* at 40-41. On December 16, 2019, the Texas Commission on Jail Standards sent Plaintiff a letter saying that it did not appear that he had used the available grievance procedure in the jail at that time and that he could resubmit his complaint after he had done so. *Id.* at 42-43.

On December 14, 2019, Plaintiff filed a grievance complaining that he was placed in segregation by Lt. Sullivan and Captain Boozer under what they called "medical observation." *Id.* at 45. However, Plaintiff said they were using a technique called "poor punishment," which he says is "designed to break a person by fundamentally unconstitutional practices." *Id.* His normal activities

have been disrupted, and he cannot use the phone, get to the toilet, or shower. *Id.* He says that the medical department has continuously denied him the use of a wheelchair or walker, and he has been in urine since December 11. *Id.* The response to the grievance by Captain Boozer says that he cannot have Plaintiff in a barracks if he cannot walk and that they need to be able to assist him to and from the medical department. *Id.*

## II. Plaintiff's Claims

Plaintiff identifies six claims in his second amended complaint. These are set out by Plaintiff as follows:

1. On 11-25-2019, Hogan, who was in Bowie County Jail in Texarkana, TX, began to suffer from severe pain in his spine, neck, and legs. Suddenly he lost feeling in both legs and fell to the floor. Medical staff were notified and responded to assist. These medical staff members had access to Hogan's medical information that includes records of serious injury to his neck and spine prior to his incarceration. However, when these staff members arrived, a decision was made to pick Hogan up from the floor and put him in a wheelchair. These staff members were trained in protocol and procedure for this type of injury, yet they did not follow protocol and procedures. They were trained that moving a person with symptoms of spine or neck injury could cause further injury. By disregarding their training and subjecting Hogan to further pain and suffering, these defendants are guilty of deliberate indifference. Hogan also wishes to being a medical malpractice claim at the state level under this court's supplemental jurisdiction as provided by 28 U.S.C. §1367. This claim applies to defendants Ashley and Pulse.

2. On 11-25-2019 at WRMC while receiving diagnosis and treatment for claim one, a nurse forcibly rammed a plastic tube or some foreign object into Hogan s anus. This is a sexual assault and a violation of the Prison Rape Elimination Act of 2003. This violates the 8th Amendment to be free of cruel and unusual punishment and Texas Law, Penal Code § 22.011 V.T.C.A. This nurse, later known to be Chandra K. Anderson, is also guilty of medical negligence. Claim two applies to Defendant Anderson.

3. Between 11-25-19 and 12-4-19, not one of the Bowie County staff members that Hogan reported this PREA violation / Sexual assault to would help him. Therefore, on 12-4-19, he wrote a note to CID" and sent it to Bowie County Sheriff s Department ("BCSD" ) stating that he needed to speak to someone regarding a sexual assault." BCSD Detective Dustin Thompson came to interview Hogan on 12-10-19 and when Thompson left, retaliation began. Hogan was threatened, moved to isolation, was left immobile in deplorable conditions and this all started after Bowie County Jail staff learned that he had reported his PREA incident. Claim three applies to Defendants: Ashley, Boozer, Sillivan, and Page.

4. Hogan suffered from PREA violations at Bowie County for more than two years. He reported such an incident on ## when he filed grievance ## [sic]. This incident was not properly investigated and resulted with the complaint being "swept under the rug." Hogan was assigned to the law library and had heard staff making comments such as "he thinks he is better than everyone else", because of his assignment. Hogan alleges the special treatment" he received, such as during strip searches, and the discrimination and lack of equal

13

protection occurred to "keep him in his place . When Hogan reported the 11-25-19 sexual assault, he was "intentionally treated differently than those who were similarly situated by the Defendants purposeful deviation from PREA protocol. This was a violation of the 14th Amendment right to equal protection and due process of law. Claim four applies to Defendants: Johnson, Brown, Page, Sillivan, and Boozer.

5.      Even though it is well documented that Hogan has spinal injuries and cannot walk without a mobility assistance device, a few days after he arrived at Ouachita River Correctional Unit in 2020, his wheelchair was taken from him and he was provided with a four legged walker. He could barely navigate with the walker and it caused him severe pain. Within a few days, the walker was taken from him as well. He was told to go back to his barracks. He fell as soon as he stepped outside the door. This is a violation of his 8th Amendment right to be free from cruel and unusual punishment. Claim five applies to Defendant Sharonda Smarjessie Long.

6.      Hogan, even as a prisoner, has the right to be protected from sexual assault. If a sexual assault does take place, the assailant is as accountable as he or she would be if they assaulted a non-prisoner. The Bowie County Sheriff Department ( BCSD") of Texas and the City of Texarkana Police Department in Texas both refused to take Hogan's report of sexual assault seriously as well as refusing to properly investigate his claim. If any person from Texas who was not incarcerated, reported a sexual assault and could identify the assailant even giving the location where this assailant could be found, charges would be filed. BCSD did not even follow up after Hogan's interview. City of Texarkana Police Department wrote there is insufficient evidence to support the listed charge". Hogan's statement was not given weight equal to that a statement by a person who is not incarcerated would be given. It apparently was considered useless. The following WRMC staff members, who make up WRMC's grievance committee, also did not give Hogan equal protection or due process of law when they did not consider facts such as Hogan reported this assault immediately, but nobody did anything: the Hospital President, Chief Nursing Officer, Quality Director, Risk Manager and Jan Burke, RN. Hogan was in the custody of ADC Director Dexter Payne when this assault took place. Hogan was not at liberty to go to the police station and report this crime. He reported it to several Bowie County staff members who failed to even acknowledge Hogan's complaint and instead retaliated against him, placing him in isolation where he was threatened by staff. The threats and retaliation were severe enough that Hogan stopped seeking relief until he transferred to a unit. Arriving at ORCU, Hogan began reporting this assault again to several staff members and through grievances. Staff members passed this information on to ADC Deputy Director William Straughn and others including Dexter Payne and Amanda Pasley. Every defendant to claim six either did not properly investigate Hogan's complaint or quickly found it as unsubstantiated . This sexual assault did take place. And because of the plaintiff's status as incarcerated, he still suffers today and has not been granted relief of any type. Claim six applies to defendants 11 thru 21.

Dkt. No. 14-1 at 4-6.

## III.    Discussion of Plaintiff's Claims

1. Deliberate Indifference After His Fall

Plaintiff contends that Nurses Ashley and Pulse were deliberately indifferent to his medical needs when they picked him up off the floor, despite knowing that he had a back or spine injury.

The Fifth Circuit has held that deliberate indifference to a convicted inmate's serious medical

needs could state a civil rights violation, but a showing of nothing more than negligence does not. *Norton v. Dimazana*, 122 F.3d 286, 291 (5th Cir. 1997); *Jackson v. Cain*, 864 F.2d 1235, 1246 (5th Cir. 1989). To show deliberate indifference, the prisoner must show (1) objective exposure to a substantial risk of serious harm, (2) the defendants had subjective knowledge of this substantial risk, (3) the defendants denied or delayed the prisoner's medical treatment despite their knowledge

of this substantial risk, and (4) this denial of or delay in treatment resulted in substantial harm. *Petzold v. Rostollan*, 946 F.3d 242, 249 (5th Cir. 2019).

Disagreement about the recommended medical treatment is generally insufficient to show deliberate indifference. *Id.*; *see also Gobert v. Caldwell*, 463 F.3d 339, 345-46 (5th Cir. 2006) (prison official acts with deliberate indifference if he "knows of and disregards an excessive risk to health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." (citing *Farmer v. Brennan*, 511 U.S. 825, 837, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994))).

Claims of negligence, medical malpractice, or that the treatment provided has not been as successful as the plaintiff would have liked are insufficient to set forth constitutional violations. *Gobert*, 463 F.3d at 346; *Norton*, 122 F.3d at 291. The fact that medical care given is not the best that money can buy or that a dose of medication may occasionally be forgotten does not amount to deliberate indifference to serious medical needs. *Mayweather v. Foti*, 958 F.2d 91, 91 (5th Cir. 1992).

In *Domino v. TDCJ-ID*, a prisoner expressed suicidal ideations, and the psychiatrist returned him to his cell after a five-minute examination. The prisoner committed suicide two and a half hours later. 239 F.3d 752 (5th Cir. 2001). The Fifth Circuit, in reversing a denial of summary judgment by the district court, stated as follows:

> Deliberate indifference is an extremely high standard to meet. It is indisputable that an incorrect diagnosis by prison medical personnel does not suffice to state a claim for deliberate indifference. *Johnson v. Treen*, 759 F.2d 1236, 1238 (5th Cir. 1985). Rather, the plaintiff must show that the officials "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs." *Id*. Furthermore, the decision whether to provide additional medical treatment "is a

> classic example of a matter for medical judgment." *Estelle v. Gamble*, 429 U.S. 97, 107 (1972).  And, "the failure to alleviate a significant risk that [the official] should have perceived, but did not," is insufficient to show deliberate indifference.  *Farmer v. Brennan*, 511 U.S. 825, 838 (1994).

*Domino*, 239 F.3d at 756; *see also Stewart v. Murphy*, 174 F.3d 530, 534-38 (5th Cir. 1999) (no deliberate indifference where the patient died from bedsores where treatment was provided and orders for care were given, despite evidence that the bedsores were not discovered during the patient's stay in the hospital, the doctors often did not review the nurses' notes or check to see if their orders were carried out, antibiotics were not prescribed although the nurses' notes said that the patient had an infection from a catheter, and the treating physician did not follow a recommendation that the patient be transferred despite knowing that the facility was understaffed).

In *Evans v. Cerliano*, civil action no. 6:07cv504, 2008 WL 906304 (E.D. Tex., March 31, 2008), the plaintiff, Billy Evans, complained that he fell while exiting the shower in the Gregg County Jail, breaking his hip. After officers came and taunted him while he lay on the floor, Nurse Betty Williamson did not examine him properly but told him that she was not authorized to do anything and got an officer and two inmates to pick him up, which Evans said was improper. *Id.* at *3.  The Court determined the prisoner's complaint that the nurse used inmates to lift him off the floor amounted to no more than negligence and did not set out a constitutional claim. *See also Allen v. Herrera*, civil action no. 4:06cv2531, 2006 U.S. Dist. LEXIS 75292, 2006 WL 2987683 (S.D.Tex., October 17, 2006) (claim that ranking officer who saw prisoner with spinal arthritis fall and ordered inmates to pick him up did not state a claim for deliberate indifference).  Plaintiff simply disagrees with the nurses' assessment of the situation and their decision to have Lt. Manning and inmate Dawson pick him up and put him in a wheelchair. This claim lacks an arguable basis in law and fails to state a claim upon which relief may be granted.

2. The Alleged Sexual Assault

Plaintiff asserts that while he was in the hospital, Nurse Anderson sexually assaulted him by ramming a plastic tube into his anus. Documents offered by Plaintiff indicate that there were no medical procedures or tests ordered that would have required such action. This claim requires further

16

judicial proceedings.

<u>3. Retaliation</u>

Plaintiff contends that after the Bowie County Sheriff's Department interviewed him on December 4, 2019, he was placed into an isolation cell and his wheelchair was taken away. He fell the next day while trying to get to the toilet and urinated on himself, and an officer called the medical department. He was taken to the infirmary, his vital signs checked, and he was returned to the cell without changing clothes. Plaintiff ascribes this treatment to retaliation.

Plaintiff states that after his interview with Thompson, Sullivan and Boozer took him back to Bravo, packed his property, and put him in an isolation cell 212, and Boozer later returned and took his wheelchair. There were no handrails in the cell, and he fell on December 11, 2019, urinating upon himself. An officer came and called the medical department, and medical personnel came, picked him up by his arms, and put him in a wheelchair. He was taken to the infirmary, where his vital signs were taken, but he was returned to his cell in the same soiled clothes he was wearing.

Plaintiff says that he complained to Warden Wilson that officers were trying to break him by using a technique called "poor punishment," but Boozer responded by saying that they could not house him in the barracks if he could not walk because they needed to be able to assist him to and from the medical department. He filed another grievance on December 19 but was rejected as untimely.

On December 17, Plaintiff says that he was told he was being transferred to the general population, but his request for a wheelchair was refused, and a disciplinary case was written against him for "refusing to leave restrictive housing." The next day, he wrote to Ashley asking for a walking cane, but she "responded with misdirection" and told him there was nothing more they could do. He was sent back to Bravo barracks on December 27, and three days later, he was transported to Arkansas.

The Fifth Circuit has explained that to prevail on a claim of retaliation, a prisoner must establish (1) a specific constitutional right, (2) the defendant's intent to retaliate against the prisoner for his exercise of that right, (3) a retaliatory adverse act, and (4) causation, meaning that but for the retaliatory motive, the complained of incident would not have occurred. *Mark v. Spears*, slip op. no.

17

22-40104, 2023 WL 5316554 (5th Cir. 2023) (citing *DeMarco v. Davis*, 914 F.3d 383, 388 (5th Cir. 2019)); *Woods v. Smith*, 60 F.3d 1161, 1164 (5th Cir. 1995).

In *Mark*, the plaintiff, Michael Mark, alleged that an officer named Greer coughed up phlegm and nasal mucus and mixed it with jelly on Mark's breakfast tray in retaliation for Mark's having verbally reported Greer to his supervisors for failing to change the water coolers. *Mark*, 2023 WL 5316554, at *5. In affirming the district court's dismissal of this claim, the Fifth Circuit explained that Mark had failed to show retaliatory intent or causation and had alleged no facts showing that Greer was aware that a prisoner, or specifically Mark, had reported him. *Id.* at *6 The Fifth Circuit also observed that Mark offered nothing to suggest that the incident would not have occurred but for the retaliatory motive. *Id.*

A similar circumstance exists in the present case. Plaintiff's second amended complaint alleges, in a conclusory manner, that "this all started after Bowie County Jail staff learned that he had reported his PREA incident." The Fifth Circuit has explained that the mere fact that one incident precedes another is not proof of a causal connection because this is the logical fallacy of *post hoc ergo propter hoc* (after this, therefore, because of this). *Huss v. Gayden*, 571 F.3d 442, 459 (5th Cir. 2009) (emphasis in original) (noting that "the *post hoc ergo propter hoc* fallacy assumes causality from temporal sequence," which is a "false inference"); *Tampa Times Co. v. National Labor Relations Board*, 193 F.2d 582, 583 (5th Cir. 1952) (*post hoc ergo propter hoc* is not sound logic). The Fifth Circuit has specifically stated that "temporal proximity is insufficient to prove 'but for' causation." *Strong v. University Healthcare Systems, L.L.C.*, 482 F.3d 802, 808 (5th Cir. 2007).

This is underscored by the fact that Plaintiff says he had previously been moved into a holding cell on the day he fell, before he reported the incident. Captain Boozer advised him that he had been placed in isolation because he could not be in the dorm when he could not walk, and Plaintiff says that he was returned to the dorm after he was medically cleared to do so.

As in *Mark*, Plaintiff offers no facts showing that the medical personnel he names in connection with this claim, Ashley and Page, were aware that Thompson had interviewed him. Plaintiff does not allege that Ashley or Page knew the context of the conversation between him and the

18

detective. Nor has he offered anything to suggest that the incidents complained about would not have occurred absent a retaliatory motive. Plaintiff's claim of retaliation lacks an arguable basis in law and fails to state a claim upon which relief may be granted.

4. PREA violations

Plaintiff complains that he suffered from PREA violations in Bowie County for over two years, although his complaint concerning Bowie County only covers the period from November 25, 2019, when he fell, to December 30, 2019, when he was transferred to the Arkansas Department of Corrections.

In any event, the Prison Rape Elimination Act does not establish a private cause of action for individual plaintiffs. *Krieg v. Steele*, 599 F.App'x 231, 232-33 (5th Cir. 2015). To the extent that Plaintiff seeks to bring a claim under the PREA, such a claim lacks an arguable basis in law and fails to state a claim upon which relief may be granted.

Plaintiff also indicates that a grievance that he filed was not properly investigated, although he refers to this grievance by saying that he "reported such an incident on ## when he filed grievance ##." Aside from the fact that this grievance is not identifiable based on the information provided, Plaintiff has no constitutional right to have grievances investigated or resolved to his satisfaction. *Geiger v. Jowers*, 404 F.3d 371, 374 (5th Cir. 2005); *Mahogany v. Miller*, 252 F.App'x 593, 595 (5th Cir. 2007). This claim lacks an arguable basis in law and fails to state a claim upon which relief may be granted.

Plaintiff also makes vague allusions to the staff, making comments such as "he thinks he is better than everyone else" because of Plaintiff being assigned to the law library. He refers to "special treatment" he allegedly received, such as during strip searches, and to claims of discrimination and lack of equal protection which he says occurred to "keep him in his place," but he does not provide any facts concerning these allegations. Similarly, Plaintiff offers no facts concerning his assertion that after he reported the sexual assault, he was "intentionally treated differently than those who were similarly situated" by the defendants' "purposeful ldeviation from PREA protocol." *See Clark v. Owens*, 371 F.App'x 553, 554 (5th Cir. 2010) (conclusory allegations that a prisoner was treated

19

differently from other similarly situated inmates are insufficient to state an equal protection claim). Plaintiff has failed to state a claim upon which relief may be granted in this regard.

5. Deliberate Indifference at Ouachita River Correctional Unit

Plaintiff complains of deliberate indifference to his serious medical needs after he arrived at the Ouachita River Correctional Unit in Arkansas, suing a medical provider named Sharonda Smarjessie Long.  He states that on January 8, 2020, she told him Bowie County had said he did not need a wheelchair, so she was taking it. When he asked her if she would leave him without any mobility, she said she was giving him a four-leg walker.  He was barely able to get around with the walker, and it caused him great pain.

A few days later, Plaintiff says that Long called him to the clinic and tried to force him to walk without the walker. He said that he could not. When he got up to leave, several officers surrounded him and took the walker.  Long told him that she was done with him and to return to his barracks, but when he tried to do this, he fell in the hallway. A free-world supervisor saw him fall and said that he would tell the day clinic, and Plaintiff said that the day clinic was the problem.  The supervisor went into the day clinic and then came out and asked Plaintiff "what's wrong with those people." A sergeant went into the clinic and returned with a couple of nurses and a stretcher. Plaintiff's vital signs showed that he had very high blood pressure, and a physician named Dr. Daniel gave Plaintiff some medication. He was helped into a wheelchair and returned to his barracks. On April 6, Plaintiff stated that he received an order for a rollator, which he still had at the time of filing the second amended complaint.

Plaintiff's claim against Long is, in essence, one of disagreement - he believed that he needed a walker, while she believed that he did not.  As such, Plaintiff has failed to state a claim upon which relief may be granted against Long. *Petzold*, 946 F.3d at 249; *Gobert*, 463 F.3d at 345-46.

Furthermore, Plaintiff states that Long is located at the Ouachita River Correctional Facility in Malvern, Hot Spring County, Arkansas.  As such, the Court has no basis upon which to assume personal jurisdiction over Long. The Civil Rights Act, 42 U.S.C. § 1983, does not confer

nationwide jurisdiction upon federal courts; instead, a federal court may exercise personal jurisdiction over a non-resident of the state where the court sits only so long as there are minimum contacts between the defendant and the forum state. *Worldwide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291-93 (1980); *see also Ray v. Collin County Sheriff's Office*, civil action no. 4:20cv856, 2022 WL 18674951 (E.D. Tex., November 21, 2022), *Report adopted at* 2023 WL 1971307 (E.D.Tex., February 13, 2023). Plaintiff has offered nothing to suggest that a medical provider for the Arkansas Department of Corrections at an ADC facility in Malvern, Arkansas, has sufficient minimum contacts with the State of Texas to justify the Court assuming personal jurisdiction over her. Plaintiff has failed to state a claim against Long in this regard, and his claims against the Arkansas defendants should also be dismissed for lack of personal jurisdiction.

<u>6. Failure to Investigate or Pursue Criminal Charges</u>

Plaintiff contends that the Bowie County Sheriff's Department and the City of Texarkana Police Department refused to take his claims of sexual assault seriously and would not properly investigate it. He says that the Sheriff's Department interviewed him but then did not follow up, and the police department told him that there was insufficient evidence. Plaintiff asserts that had he been a free-world person reporting a sexual assault and could identify the assailant and the location where the person would be found, charges would have been filed.

The Fifth Circuit has held that there is no constitutional right to have someone else criminally prosecuted. *Oliver v. Collins*, 904 F.2d 278, 281 (5th Cir. 1990). Consequently, the fact that the Bowie County Sheriff's Department and the City of Texarkana police department did not pursue criminal charges against Anderson as Plaintiff believes they should have did not violate Plaintiff's constitutional rights.

Plaintiff also sues a number of individuals at Wadley Regional Medical Center, including the hospital president, the chief nursing officer, the quality director, and Nurse Jan Burke, the patient advocate, saying that they did not take any action when he reported the incident. A letter that Plaintiff received from Nurse Burke, dated November 24, 2020 (Dkt. No. 14-2, p. 7) says that and

investigation was conducted, but because of the length of time which had elapsed and the fact that Nurse Anderson and the officers who were with Plaintiff could not be interviewed, Plaintiff's grievance could not be substantiated.

Plaintiff similarly complains that officials at the Bowie County Correctional Center and the Arkansas Department of Corrections failed to acknowledge his complaint, did not properly investigate it, or concluded that it was "unsubstantiated" even though it did, in fact, happen. Even assuming that the hospital officials are state actors for purposes of § 1983 liability, Plaintiff has failed to state a claim upon which relief may be granted because he has no constitutional right to have grievances or complaints investigated or resolved to his satisfaction. *Geiger v. Jowers*, 404 F.3d 371, 374 (5th Cir. 2005); *Minix v. Stoker*, 289 F.App'x 15, 17 (5th Cir. 2008).

**IV.    Conclusion**

28 U.S.C. §1915A requires that as soon as practicable, district courts must review complaints wherein prisoners seek redress from governmental entities or their employees and identify cognizable claims or dismiss the complaint or any portion thereof if the complaint is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief.

A complaint fails to state a claim upon which relief may be granted where it does not allege sufficient facts that, taken as true, state a claim that is plausible on its face and thus does not raise a right to relief above the speculative level. *Montoya v. FedEx Ground Packaging System Inc.*, 614 F.3d 145, 149 (5th Cir. 2010) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)); *Streater v. Davis*, slip op. no. 21-11253, 2022 WL 10362714 (5th Cir. 2022). A claim has factual plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Hershey v. Energy Transfer Partners, L.P.*, 610 F.3d 239, 245 (5th Cir. 2010); *Ashcroft v. Iqbal*, 556 U.S. 662, 678, 129 S.Ct. 1937, 1949 (2009). This plausibility standard is not akin to a probability requirement,

but asks for more than a possibility that the defendant has acted unlawfully. *Twombly*, 550 U.S. at 556.

Detailed factual allegations are not required, but the claim must contain more than "an unadorned, the-defendant-unlawfully-harmed-me accusation." *Iqbal*, 556 U.S. at 677-78. A pleading offering "labels and conclusions" or a "formulaic recitation of the elements of a cause of action" will not suffice, nor does a complaint which provides only naked assertions that are devoid of further factual enhancement. *Id*. at 678.

A complaint may be dismissed if a plaintiff fails to "nudge [his] claims across the line from conceivable to plausible," if the complaint pleads facts merely consistent with or creating a suspicion of the defendant's liability, or if a complaint lacks a factual allegation regarding any required element necessary to obtain relief. *Rios v. City of Del Rio, Tex.*, 444 F.3d 417, 421 (5th Cir. 2006). *Pro se* plaintiffs are held to a more lenient standard than are lawyers when analyzing a complaint, but *pro se* plaintiffs must still plead factual allegations which raise the right to relief above the speculative level. *Chhim v. University of Texas at Austin*, 836 F.3d 467, 469 (5th Cir. 2016). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.

Although all well-pleaded facts are taken as true, the district court need not accept as true conclusory allegations, unwarranted factual inferences, or legal conclusions. *Gentilello v. Rege*, 627 F.3d 540, 544 (5th Cir. 2010) (citing *Plotkin v. IP Axess Inc.*, 407 F.3d 690, 696 (5th Cir. 2005)). Dismissal is proper if a complaint lacks a factual allegation regarding any required element necessary to obtain relief. *Rios*, 444 F.3d at 421.

The Fifth Circuit has explained that while *pro se* complaints are construed liberally, the court is still bound by the allegations of the complaint and is not free to speculate that the plaintiff "might" be able to state a claim if given yet another opportunity to amend the complaint. *Macias v. Raul A. (Unknown), Badge No. 153*, 23 F.3d 94, 97 (5th Cir. 1994). The court explained as follows:

For example, if an IFP plaintiff, in amending his complaint through a response to a questionnaire, alleges in his response that he received inadequate medical care while incarcerated, we should not reverse the dismissal of the complaint on the basis that the plaintiff could possibly add facts that would demonstrate that he was treated with deliberate indifference in the medical care that he received. As another example, if an IFP prisoner asserts in the questionnaire response that he has been denied recreation time, we should not reverse dismissal on the ground that he might also be able to assert a claim that the denial was in retaliation for his having filed a grievance.

*Id*. at 97.

Other than his complaint against Nurse Anderson, Plaintiff's pleadings fail to state a claim upon which relief may be granted. As in <u>Macias</u>, the Court is not free to speculate that Plaintiff might be able to state a claim if given yet another opportunity to amend. These other claims should be dismissed without prejudice for failure to state a claim.

## RECOMMENDATION

It is accordingly recommended that all of the Plaintiff's claims except for his claim against Nurse Chandra Anderson be dismissed without prejudice for failure to state a upon which relief may be granted and, as against the Defendants in the State of Arkansas, for lack of personal jurisdiction.

A copy of these findings, conclusions and recommendations shall be served on all parties in the manner provided by law. Any party who objects to any part of these findings, conclusions, and recommendations must file specific written objections within 14 days after being served with a copy.

In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the Magistrate Judge's proposed findings, conclusions, and recommendation where the disputed determination is found.

An objection which merely incorporates by reference or refers to the briefing before the Magistrate Judge is not specific, and the district court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Commission*, 834 F.2d 419, 421 (5th Cir. 1987).

Failure to file specific written objections will bar the objecting party from appealing the

factual findings and legal conclusions of the Magistrate Judge which are accepted and adopted by the district court except upon grounds of plain error.  *Duarte v. City of Lewisville*, 858 F.3d 348, 352 (5th Cir. 2017).

SIGNED this the 26th day of January, 2024.

_____

J. Boone Baxter
UNITED STATES MAGISTRATE JUDGE